| | |
|---|---|
| 1 | PHILIP J. KEARNEY - 114978 |
| |     PKearney@mpbf.com |
| 2 | THOMAS P. MAZZUCCO - 139758 |
| |     TMazzucco@mpbf.com |
| 3 | MURPHY, PEARSON, BRADLEY & FEENEY |
| | 580 California Street, Suite 1100 |
| 4 | San Francisco, CA 94104-1001 |
| | Telephone:    (415) 788-1900 |
| 5 | Facsimile:     (415) 393-8087 |
| 6 | Attorneys for Defendant |
| | BERNARD CURRAN |

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 3:21-cr-00453-SI |
|     Plaintiff, | **DECLARATION OF RETIRED DBI DEPUTY DIRECTOR EDWARD SWEENEY IN SUPPORT OF DEFENSE SENTENCING MEMORANDUM** |
| v. | |
| BERNARD CURRAN, | |
|     Defendants. | |

I, Edward Sweeney, declare:

1. I am a Retired Deputy Director of the City and County of San Francisco Department of Building Inspection ("DBI"). I make this Declaration in support of Defendant Bernie Curran's Sentencing Memorandum. The facts set forth herein are true based on my own knowledge except where stated to be on information and belief, and as to those I believe such facts to be true.

2. I was employed at DBI in various capacities during an approximate twenty-one-year period from Fegbruary1999 to December 2020. During my career at DBI I served as both a Building Inspector and Senior Building Inspector before becoming Deputy Director of the Agency. I served as a DBI Deputy Director for fourteen years. Before my career at DBI, I worked as a union carpenter in San

- 1 -

Francisco from 1974-1999.

3. During my term as a DBI Deputy Director, I worked with and/or supervised both Bernard Curran and Patrick O'Riordan. I can say that it was well-known at DBI that there was a degree of tension between the two men; they certainly would not have been considered friends. I believe the tension was based in part on a degree of jealousy harbored by Mr. O'Riordan towards Mr. Curran because Mr. Curran—having worked in the industry for decades—was well-liked by contractors in San Francisco. At a minimum, the men were very different, with Mr. Curran being friendly and outgoing and Mr. O'Riordan often working with his door closed.

4. I have been informed of a statement made in the investigation by Mr. O'Riordan in reference to Mr. Curran in which Mr. O'Riordan stated that, '..it was unusual for a Senior Building Inspector to go do site visits and final approvals because they are typically far too busy with paperwork and supervising their subordinates.' I believe this statement to be flatly inaccurate; in fact, it was common in my experience for Senior Inspectors to do site visits. When I worked as a Senior Inspector, I regularly made site visits and considered them to be a normal part of my job responsibilities.

5. It was similarly common for Senior Building Inspectors to conduct inspections outside of their own districts. These inspections happened for a variety of reasons; often when a district inspector was just too busy, or when a 'hot job' was pending—for instance when a concrete truck was waiting to conduct a pour. There were other times when multiple inspectors would call in sick or be on leave and construction teams were idle waiting for a permit sign-off; in these situations inspections were done by anyone available (including inspectors and senior inspectors out of district). Interpersonal factors also sometimes necessitated out-of-district help, such as when an inspector or senior inspector had a personal animus with a particular contractor or when a building presented technical challenges beyond as inspector's competence. Also, if a particular contractor could not reach the assigned district inspector, it was common for them to call other DBI inspectors to see if they could quickly obtain needed authority for procedural steps like 'sheetrock signoffs' or 'okays to cover' a building's framing. I received and responded to these requests myself; doing so was not a sign of corruption but of a collective motivation to get the job done. The simple truth is that not everyone at DBI—including some senior inspectors—were good in the field or enjoyed being there, others often

needed to pick up the slack. If a district had twelve inspections scheduled on a particular day and the assigned inspector could only handle eight, something had to be done to keep construction projects on schedule.

6. Regarding Mr. Curran himself, he was considered—including by me—to be the hardest working inspector at DBI. He served as a 'backstop' for the Department, and I know for a fact that no other inspectors at DBI did more inspections than Mr. Curran. He would regularly perform twenty a day, all with a smile on his face and without customer or client complaint. His high workload was related to his basic competence; other inspectors would routinely seek his help or advice with difficult jobs. I am personally aware of situations where Mr. Curran and other inspectors were sent out of district on Mr. O'Riordan's express order. While I am unaware of the exact number of inspections Mr. Curran performed in his career at DBI, the number is certainly well into the tens of thousands.

7. Mr. Curran worked under my supervision for approximately ten years. During that period, I personally read and signed off on his employment evaluations, often after Mr. O'Riordan's initial review. I can describe Mr. Curran's evaluations during the period of my review as glowing; he routinely scored very high on our internal grading scale. In none of the evaluations—including those signed by Mr. O'Riordan—was Mr. Curran ever criticized for his activities at DBI, or for conducting inspections outside of his own district. To my knowledge Mr. O'Riordan never expressed displeasure with Mr. Curran's work ethic or job performance. Mr. Curran was a model employee who turned in his necessary paperwork daily.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 6 day of July 2023 at San Francisco, California.

Edward Sweeney

AGM.4632214.docx