Philip J. Kearney 114978
    PKearney@mpbf.com
Thomas P. Mazzucco - 139758
    TMazzucco@mpbf.com
MURPHY, PEARSON, BRADLEY & FEENEY
580 California Street, Suite 1100
San Francisco, CA 94104-1001
Telephone: (415) 788-1900
Facsimile: (415) 393-8087

Attorneys for Defendant
BERNARD CURRAN

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>BERNARD CURRAN,<br><br>    Defendants. | Case No.: 3:21-CR-00453-SI<br><br>**DEFENDANT BERNARD CURRAN'S SUPPLEMENTAL SENTENCING MEMORANDUM ADDRESSING RESTITUTION** |

## I.    INTRODUCTION

Bernard Curran plead guilty to two counts of Accepting Illegal Gratuities on December 9, 2022. (Doc. 52). On July 14, 2023, he was sentenced to serve a term of one year and one day in the Bureau of Prisons, submit to a two-year period of supervision after his release, and pay a $200 special assessment. (Doc. 71). Prior to sentencing, the Department of Building Inspection ("DBI") through the Government asked the Court for a $1,014,039.15 restitution award based on past and future anticipated costs of an audit ("Audit") of Mr. Curran and his co-defendant's work. (Doc. 70). The Government also presented the Court with an alternate restitution award calculation of $945,180.27, based on work expended by DBI on separate "Tiers" of the Audit. After objection by Mr. Curran, who has a negative cash flow (*See* PSR Doc. 68 at ¶ 79), the Court set a Restitution Hearing date of October 6, 2023. On September 29,

2023, the San Francisco City Attorney's Office in a letter to this Court submitted a third demand of $964,517.49 for Mr. Curran, $805,327.38 of which are anticipated future costs.

Also on September 29, 2023, the United States submitted a list of "Notices of Violation" ("NOVs" or "Notices") to the court purporting to demonstrate twenty-four flaws in inspections associated with Mr. Curran or Mr. Santos. Eleven of those NOVs related to projects in which Mr. Curran performed an inspection (almost uniformly among other DBI inspectors working on the same project). For context, those eleven Notices spanned a sixteen year period of Mr. Curran's career, equating to less than one per year. None of the eleven notices involving Mr. Curran remotely relate to serious structural or life-safety issues; on the contrary and as will be explained, they relate to such things as a planter box extending a few extra feet onto a sidewalk, or the wrong type of windows being used on a project. And even those petty violations may have taken place in the years after Mr. Curran's inspection. None of the Notices against Mr. Curran appear to relate to Santos projects; demonstrating once and for all—as Mr. Curran has steadfastly maintained—that he was never wrongly influenced by the Santos rugby donations.

Further, the hours spent on individual properties as estimated by the DBI appear to be significantly bloated, especially on properties in which Mr. Curran had only a minimal role. Charging Mr. Curran anything for this Audit—especially when the government has never proven that he was corruptly performing inspections—much less the largely anticipatory roughly seven-figure amount noted above, is both unjustified and mean-spirited.

Not only is the Audit itself unjustified, but its scope and implementation—as will be demonstrated below by sworn declaration—are flawed to the point of being suspect.

## II. THE GOVERNMENT'S RESTITUTION DEMAND IS UNWARRANTED

As stated in his Sentencing Memorandum, Mr. Curran *strongly* objects to the payment of restitution to the Department of Building Inspection or City and County of San Francisco. This Court should deny this restitution request outright or determine an appropriate amount as prescribed by law, not in accordance with estimates that may extend years into the future.

### A. THERE IS NO PROOF THAT DEFENDANT APPROVED PERMITS FRAUDULENTLY, AS SUCH THE AUDIT IS UNRELATED TO THE CHARGED CONDUCT AND NOT COMPENSABLE UNDER THE MVRA.

Mr. Curran is not charged with issuing false permits or providing less than diligent work during

DEFENDANT BERNARD CURRAN'S SUPPLEMENTAL SENTENCING MEMORANDUM ADDRESSING RESTITUTION

CASE NO. 3:21-CR-00453-SI

his years at the DBI. Unrebutted sworn testimony by retired DBI Deputy Director Ed Sweeney before this Court proves just the opposite:

> "Regarding Mr. Curran himself, he was considered—including by me—to be the hardest working inspector at DBI. He served as a 'backstop' for the Department, and I know for a fact that no other inspectors at DBI did more inspections than Mr. Curran. He would regularly perform twenty a day, all with a smile on his face and without customer or client complaint. His high workload was related to his basic competence; other inspectors would routinely seek his help or advice with difficult jobs. (Doc. 69-1, ¶ 6).

He was supervised directly by both the past and current leadership of DBI and found at all times relevant to perform at the highest standards of that Department:

> Mr. Curran worked under my supervision for approximately ten years. During that period, I personally read and signed off on his employment evaluations, often after Mr. O'Riordan's initial review. I can describe Mr. Curran's evaluations during the period of my review as glowing; he routinely scored very high on our internal grading scale. In none of the evaluations—including those signed by Mr. O'Riordan—was Mr. Curran ever criticized for his activities at DBI, or for conducting inspections outside of his own district. To my knowledge Mr. O'Riordan never expressed displeasure with Mr. Curran's work ethic or job performance. Mr. Curran was a model employee who turned in his necessary paperwork daily. (*Id*. at ¶ 7).

The evidence is also uncontested that Mr. Curran strongly believes that he never issued a permit that was not warranted by applicable building codes. (Doc. 51, Plea Agreement ¶ 2). The Government agrees that Mr. Curran "[n]ever approved a permit for DEVELOPER-1 that was not warranted." (*Id*.) No instance of corrupt collusion between either DEVELOPER 1 or Mr. Curran's co-defendant Mr. Santos has been uncovered by the Audit, despite the fact that all properties worked on together by Mr. Curran and Mr. Santos have already been analyzed. As such, the Audit has descended into an extensive search for mistakes from a highly competent building inspector. The extreme paucity and slight severity of the NOVs issued to date—as will be discussed further below—is strong evidence of this fact.

Had Mr. Curran taken his job less seriously or acted corruptly regarding the issuance of permits or conducting inspections, perhaps the requested restitution would be reasonable. In that respect this case is very different from *United States v. Schurman*, 634 F.Supp.3d 704, 708-709 (2022), relied on by the Government. (Doc. 70 at p.11) In *Schurman*, the defendant defrauded property-owning clients by peddling fake engineering inspection reports (also known as "special inspection reports"), where the defendant would falsely certify that engineers had inspected certain aspects of jobs and forged their

- 3 -

| DEFENDANT BERNARD CURRAN'S SUPPLEMENTAL SENTENCING MEMORANDUM ADDRESSING RESTITUTION | CASE NO. 3:21-CR-00453-SI |

signatures. (*Schurman*, supra at 710-711.) In *Schurman*, the reality was that no engineering inspections had ever occurred—leading to an order of $7,905 in restitution payable to the City and County of San Francisco under the Mandatory Victims Restitution Act ("MVRA")—to cover the legitimate costs of ensuring that the properties in question complied with the applicable codes. (*Id.*)

Here, the evidence indicates that Mr. Curran did *not* sell inspection reports inappropriately. He accepted $30,000 in loan forgiveness and $9,600 in donations on behalf of a youth sports team not based on issuing false permits or conducting fraudulent inspections. As *Schurman* itself noted, "[m]ost government activity after a crime will not be eligible for restitution under the MVRA." *Id.* at 712. The Court went on to state that "To qualify as a victim under the MVRA, a person must have been "directly and proximately harmed by the offense." Citing 18 U.S.C. § 3663(A)(a)(2). Here, there has never been a showing by the Government that Mr. Curran's crimes directly affected the DBI. Damage to the Department's reputation is not compensable under the MVRA.

**B.    THE AMOUNT OF RESTITUTION REQUESTED IS UNJUSTFIED AND UNCERTAIN**

It is the Government burden to "provide the court with enough evidence to allow the court to estimate the full amount of the victim's losses with some reasonable certainty." *United States v. Kennedy*, 643 F.3d 1251, 1261 (9th Cir. 2011). Here, the evidence shows that there are serious concerns regarding not only the accuracy of the government's restitution estimate, but also the equity of subjecting Mr. Curran to such an egregiously unjustified punishment. Attempting to predict over $800,000 of future audit costs based on an ever-shifting calculus is the seeming antithesis of reasonable certainty.

**1.    THE AUDIT IS OVERBROAD AND ITS HOURS ARE INFLATED**

**a. Overbreadth**

The DBI Audit began in January 2022, based on a belief that Mr. Curran "acted outside the scope of his official responsibilities in exchange for a financial benefit to himself and others." (*See* Exhibit 1 to Declaration of Ed Sweeney, attached as Exhibit A, at p.1) At the time, Mr. Curran was under indictment for the crime of Honest Services Fraud based on an indictment ("Indictment") filed on November 16, 2021. (Doc. 14). As part of the alleged scheme to defraud in the Indictment, Mr. Curran was accused of "provid[ing] corrupt benefits to Mr. Santos' clients" including improperly giving "final

inspection approval" on at least two occasions in exchange for financial benefits. (*Id*. at ¶ 14). Mirroring the Indictment, the stated purpose of the Audit which began two months later was to search for Curran's "public integrity breeches" including Curran's "illegal acceptance of financial benefits from Rodrigo Santos…as well as a developer…looking specifically for projects Mr Curran "signed off on." (*See* Exhibit A-1 attached)." In short, Mr. O'Riordan and DBI were under the belief when they started the Audit that Mr. Curran was selling permits to developers. As a consequence, the broad Audit criteria that have driven the restitution demand to nearly seven figure heights have remained in place.

However, and as noted previously, the initial belief in the Indictment that Mr. Curran was selling permits has been disproven. On November 28, 2022, approximately one year after the initial Indictment and eleven months after the Audit was initiated, the current Superseding Information was filed. (Doc. 47). In it, Mr. Curran was charged only with Accepting Illegal Gratuities. (*Id*.) Two weeks later, on December 9, 2022, The Plea Agreement was filed with both sides agreeing that Mr. Curran never "approved a permit for DEVELOPER-1 that was not warranted." (Doc 51 ¶ 2).[1] The Audit of Tier 1 properties (which involved both Mr. Curran and Mr. Santos) has likewise not revealed the improper issuance of a permit to Mr. Santos. Despite this change of facts, the Audit rumbles on, effectively now looking for mistakes committed by Mr. Curran in the past. As known by the sworn testimony of retired DBI Deputy Director Dan Lowry, mistakes in inspections do not equate with corruption.[2]

The Audit is also overbroad in the subject matter within projects being examined. In his Letter (Exh. A-1), Mr. O'Riordan noted that "Inspector Curran had at times performed plan review…"; and that "The Audit team members searched DBI's own data and records for evidence of revision of permits; insufficient plan checks; permits requiring special scrutiny (e.g. excavation, structural, seismic, sprinklers on separate permits, etc.); slope protection reviews; missing trade permits; missing inspections; missing special inspections; missing addenda; and complaints not investigated."

---

[1]Corresponding language was not inserted in the Plea Agreement regarding the Rugby Club donations, but there is no proof that Mr. Curran ever wrongfully issued a permit to Mr. Santos for personal benefit. And the Audit has not uncovered such evidence.

[2]Regarding the accusations of shortcomings on a small number of Mr. Curran's tens of thousands of lifetime inspections, I would note that all construction work projects are inherently imperfect; the failure to order the removal of a non-bearing wall or check that a sprinkler permit was obtained by an architect after the fact, are not necessarily signs of corruption, but signs of the day-to-day judgement calls, accommodations, and even mistakes that were made by inspectors at DBI. (Doc. 69-2 at ¶ 7).

- 5 -

However, many of these described areas of review had nothing to do with Mr. Curran. For instance, "plan reviews" and plan checks are performed by a completely different Division of DBI ("Permit Services") than Mr. Curran's "Inspection Services." (Exh. A at ¶ 8). Potential oversights committed by DBI engineers or personnel in the Permit Services Division should not be attributed to Mr. Curran or reviewed in his audit, that division is on a different floor and performs a different function than Mr. Curran's Inspection Services Division. (*Id.*).

Spending extensive time on the review of Tier 2 properties with a "steep slope or (in a) seismic hazard zone" is also "non-sensical" according to retired DBI Deputy Director Sweeney. (*Id.* at ¶ 10). Such reviews are not conducted by DBI building inspectors, they are the subject of the City's *Slope and Seismic Hazard Protection Act* ("SSPA" or "Act"). *Id.* The purpose of the SSPA is to clarify the permit process for projects subject to the Act; that is, properties in a seismic hazard zone or with an average slope of 4 horizontal to 1 vertical. *Id.* The SSPA mandates a separate permit submittal process, checklist, and review committee, all under the supervision of a DBI Plan Review Engineer. The Act requires inspections and third party peer review by a geotechnical engineer and the approval of a structural advisory committee that has a concurrent mandate to provide special reports to DBI Plan Engineers. None of this process has anything to do with Mr. Curran, who is not an engineer. Based on Mr. Sweeney's knowledge of DBI, charging Mr. Curran for the review of these documents does not seem appropriate based on the stated goals of the Audit. *Id.*

### b. Hours Inflated

At the outset, Mr. O'Riordan's characterization in the Letter of the manpower involved in DBI's Audit is extremely inaccurate. In the Letter, Mr. O'Riordan stated: "To perform this thorough review of records for the Audit, including determining the scope and extent of Santos and Curran projects, **DBI dedicated a team of thirteen full-time building inspectors and administrative personnel**." (emphasis added). (Exh. A-1 at p.1). Based on the hours reported as of July 24, 2023, it appears that *no* employee worked full time on the Audit. Two employees (Trevor Bryne and Fergal Clancy) worked less than one year's full time on the project at 1545.50 and 1389.25 hours respectively. The rest of the DBI employees listed worked between 2 and 434.5 hours with six working 100 hours or less.

Mr. Sweeney, who himself examined public documents for 80 properties listed in the Audit, was

highly critical of the apparent rampant padding of hours by members of the Audit. (Exh. A at ¶ 11). He rarely spent more than 15-20 minutes assessing the complete permit and inspection history of a given property when the same research by DBI personnel in the Audit took hours as will be discussed further below. (*Id*.)

Also in his opinion, a large portion of the properties on the list should not have been re-inspected at all; they merited at most only a cursory review based on Mr. Curran's minor role in the projects. (*Id*.) Mr. Sweeney spent decades using the DBI database and is familiar with the available data. Using that database apparently requires the simple entry of an address, followed by the click of a button that brings the user to a 'dashboard' screen called a "Permit Details Report." (*Id*.) The first page of these reports lists a complete permit history of the property which can be viewed in a matter of seconds, including a list of all special inspections. (*Id*.) In his own review of properties audited by DBI in this investigation, he rarely spent more than 15-20 minutes to assess the complete permit and inspection history of a given property, and to determine (on rare occasion) if the property needed follow-up. (*Id*.) He also reviewed the 16-question "DBI Address Audit" application "App" used by DBI personnel in this case. He contends based on his own experience that the relevant information requested in that App is readily available through this dashboard. (*Id*.) He is highly skeptical of the claims of DBI personnel who listed multiple hours to do this straightforward "Audit Research." (*Id*.)

One (of many) examples of unnecessary over-billing by DBI inspectors can be found in the Audit review of a 2016 project to add a unit at 2135 California Street. (*Id*. at ¶ 12). Using publicly accessible documents appended to his Declaration, Mr. Sweeney determined that fourteen inspections were conducted on the property during seven field visits by five different DBI inspectors and a special (or private third-party) inspector. (*Id*.) The inspections occurred between October 12, 2017, and June 27, 2018. Mr. Curran performed just one of those fourteen inspections (the first) on October 12, 2017, when he examined the "Reinforcing Steel" commonly known as 're-bar.' (*Id*.) After that, the following inspections were made by other DBI personnel, "Rough Frame" (on November 16, 2017, November 17, 2017, and January 8, 2018); "Insulation" (on January 9, 2018); "Sheetrock Nailing" (on January 19, 2018); and "Final Inspection/Approved" (on June 27, 2018). Also, a special inspector separately reviewed "Fenestration Installation (windows), "Insulation Installation," "Whole House Fan," "Hot

- 7 -

Water System Distribution," "Duct Leakage Diagnostic(s)," "Lighting – Multi Family Dwelling," and a second "Duct Leakage Diagnostic Test (all signed off on by yet another DBI Inspector, on June 12, 2-18). In Mr. Sweeney's opinion, the Audit review of this property should have taken a matter of minutes at a computer screen since Mr. Curran's initial (and straightforward) inspection was followed by thirteen others done by separate people including a final by a different DBI Inspector. (*Id*.) Certainly, any grave misconduct by Mr. Curran would have been spotted by this small army of independent reviewers. Instead, the Audit charges Mr. Curran 7.5 hours of time by three different auditors: 1) Trevor Byrne - .5hrs of "Audit Research;" 2) Edward Donnelly[3] - 2.5hrs "Audit Research," and 3) Fergal Clancy - 4.5hrs "Inspection Quality Control Office." What is especially confounding (according to Mr. Sweeney) is that the re-bar which was inspected by Mr. Curran on this project 6 years ago has long since been covered over by concrete, making it difficult if not impossible to inspect. (*Id*.) As he notes in his Declaration, Mr. Sweeney struggled to imagine what took the Audit Team almost a full day of work to review this property. (*Id*.)

As noted, Mr. Sweeney's declaration is replete with these examples. On one occasion, Mr. Curran responded on an emergency basis to a flood at 2670 15th Street in 2017. On arrival, he immediately issued and approved an emergency shoring permit to install a temporary wood beam in the building's garage to support an unsupported interior footing. (*Id*. at ¶ 16). Thereafter, private engineers took over the project and completed the work with no involvement of Mr. Curran.  For that one act on the project—supervising the installation of an emergency (and temporary) beam to support a failing structure—Mr. Curran was charged with two hours of "Audit Research" by Trevor Byrne. (*Id*.)

**2.  THE FEW "NOVs" AND THEIR LACK OF SEVERITY UNDERPIN THE AUDIT'S LACK OF UTILITY IN KEEPING THE CITY SAFE**

As noted, the DBI recently disclosed twenty-four "Notice[s] of Violation" ("NOVs" or "Notices") issued as a result of the Audit. According to Mr. Sweeney, NOVs are fairly common; DBI generally issues them on a daily basis with approximately seventy issued per month. (*Id.* at ¶ 16). These notices stem typically from a homeowner exceeding the scope of a permit, work being done without permit, or a mistake being made in the permitting or inspection process. (*Id*.) Mr. Sweeney personally

---

[3]Since determined to have a conflict with the consequent deletion of these hours.

DEFENDANT BERNARD CURRAN'S SUPPLEMENTAL SENTENCING
MEMORANDUM ADDRESSING RESTITUTION

CASE NO.
3:21-CR-00453-SI

reviewed the NOVs at issue in this case; a summary list of them is attached to his Declaration. (*See* Exh. A-9). Only eleven of the twenty-four NOVS involved inspections performed by Mr. Curran, the other thirteen were apparently associated with Mr. Santos. The eleven NOVs attributed to Mr. Curran spanned a period of sixteen years, not even a rate of one per year. With a large team of DBI personnel pouring over Mr. Curran's work, approximately one NOV for every two years of Mr. Curran's career is being found.

The lack of severity of the NOVs found during the audit were just as significant to Mr. Sweeney as their rarity. (*Id*. at ¶ 20). None of the violations warranted a "Red Tag" where a property is deemed unsafe for habitation or involved a serious structural issue. (*Id*.) Further, it is difficult to determine when the violations cited in the NOVs occurred; that is, did the misplacement of a sidewalk planter box discussed below occur before or after Mr. Curran's inspection? (*Id*.) It is extremely common in Mr. Sweeney's experience for homeowners in San Francisco to perform unpermitted work on their property after a DBI permit inspection has been completed. (*Id*.) That is why a retroactive inspection and NOV is potentially misleading because it fails to account for intervening causes. (*Id*.)

One of the NOVs against Mr. Curran involved a 2017 upgrade to a townhouse property located at 267 Hartford Street. (*Id*. at ¶ 21). The work involved the addition of a large horizontal and vertical expansion of the property including excavation. (*Id*.) The NOV alleged that front planters (See picture from NOV attached to Mr. Sweeney Declaration Exh. A-10), were misplaced on the sidewalk, (non-permeable) concrete had been poured on the driveway, and a decorative transom window over the front door had not been installed. Even assuming these minor conditions existed six years ago when Mr. Curran visited the property, they certainly do not negatively impact the safety of San Franciscans, the stated purpose of the Audit.

Another of the NOVs involved a 2006 permit application at 794 Andover Street "To Erect Three-Story Two-Family Dwelling." (*Id*. at ¶ 21). The original plans for the construction called for two non-operable windows to be installed on the West-facing property line. (*Id*.) The 2023 NOV stated there were now operable windows in that location. (*Id*.) Mr. Curran visited the property once to issue a 'Final' in 2006; preceding his final were six other DBI inspections, separate electrical, plumbing, and SFFD inspections, and 12 special inspections. (*Id*.) Seventeen years after the fact it is difficult if not impossible

| DEFENDANT BERNARD CURRAN'S SUPPLEMENTAL SENTENCING MEMORANDUM ADDRESSING RESTITUTION | CASE NO. 3:21-CR-00453-SI |
|---|---|

to know if these operable windows were inserted during the original renovation or after. (*Id.*) Regardless of which conclusion is drawn regarding the date of their insertion, this type of violation almost two decades after Mr. Curran visited the property does not justify the ungodly cost of this runaway train of an Audit.

### III. <u>CONCLUSION</u>

As discussed, the Government is unable to meet its burden of estimating the victim's losses with reasonable certainty. Further, since there is no proof that Mr. Curran ever issued a permit fraudulently, the City of San Francisco is not entitled to restitution under the MRVA. Further, sworn testimony has demonstrated that the DBI Audit is highly suspect; it has morphed beyond its initial legitimate roots into a nightmarish vanity project that is seen as highly disproportionate by interested citizens. (*See* Letter of Katharine Wright attached as Exhibit B). Her words, that the monumental fine being requested would serve only to 'ruin a man's financial life,' ring true.

By all accounts, Mr. Curran is a loving and supportive father, brother, and son. He serves the community by volunteering in several capacities in support of youth sports and alcohol addiction programs in San Francisco. He has maintained steady employment and has no criminal history.

When faced with the current charges, Mr. Curran admitted his guilt, cooperated with the Government, and committed the rest of his life to making amends with the people of San Francisco. He broke the law by accepting illegal gratuities, but his character and work product fall far short of that of a criminal. Once he pays his debt to society by going to prison, he should be allowed the chance to re-build some semblance of a life without the mean-spirited duty of paying for a future—and unnecessary—investigation.

//
//

DEFENDANT BERNARD CURRAN'S SUPPLEMENTAL SENTENCING MEMORANDUM ADDRESSING RESTITUTION

CASE NO.
3:21-CR-00453-SI

The Court should not impose restitution on Mr. Curran. If the Court seeks to impose some amount, it should impose a portion of the $42,379.47 past Audit costs attributed to him by the City Attorney's Office in its September 29, 2023 letter previously submitted to the Court, and waive any portion of the $805,327.38 "future costs" somehow calculated by the Government.

Dated: October 5, 2023

MURPHY, PEARSON, BRADLEY & FEENEY

By /s/ Philip J. Kearney
Philip J. Kearney
Thomas P. Mazzucco
Attorneys for Defendant
BERNARD CURRAN

PJK.4718062